Filed 1/27/17 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>VICTOR TYRONE GARRETT,<br><br>      Defendant and Appellant. | C067436<br><br>(Super. Ct. No. 08F09401)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION<br>FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>ERION DEMONTA VARNADO,<br><br>      Defendant and Appellant. | C069886<br><br>(Super. Ct. No. 08F09401)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION<br>FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion on transfer filed January 20, 2017, in the above causes be modified as follows: under the heading of "*Sentencing*" in part VIII B., replace

1

the eighth paragraph beginning: "Here, as in *Franklin*, *supra*, 63 Cal.4th 261" with the following:

Here, as in *Franklin*, *supra*, 63 Cal.4th 261, neither Garrett nor Varnado comes within any of section 3051's exclusions. Thus, Garrett and Varnado are both beneficiaries of the newly enacted provision in section 3051 that "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin*, *supra*, 63 Cal.4th at p. 281.) In short, Senate Bill No. 260 has rendered moot the *Miller* claim, *supra,* 132 S.Ct. 2455 originally brought by Garrett by superseding his trial court-imposed sentence, effectively reforming the parole eligibility date consistent with the Eighth Amendment. Even though Varnado originally did not make a *Miller* claim based on his trial court-imposed sentence, the remedy in section 3051 also applies to him.

At the end of this paragraph, following "him," add a footnote that reads as follows:

Section 3051 sets the time for a youth offender parole hearing at 15, 20, or 25 years based on the longest term of imprisonment for an "offense or enhancement." (§ 3051, subd. (a)(2)(B).) We do not reach the issue of the minimum time of incarceration that must elapse before a youth offender parole hearing be conducted for each defendant.

This modification does not change the judgment.

The petition for rehearing filed by Erion Demonta Varnado is denied.

| /s/ |
HULL, Acting P. J.

| /s/ |
ROBIE, J.

| /s/ |
HOCH, J.

2

Filed 1/20/17 (opinion on transfer) (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C067436 |
| v. | (Super. Ct. No. 08F09401) |
| VICTOR TYRONE GARRETT, | OPINION ON TRANSFER |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C069886 |
| v. | (Super. Ct. No. 08F09401) |
| ERION DEMONTA VARNADO, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

---

\*      Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I through VII of the discussion.

APPEALS from judgments of the Superior Court of Sacramento County, Laurie M. Earl and James P. Arguelles, Judges. Affirmed in part and remanded with directions.

Barbara Michel, under appointment by the Court of Appeal, for Victor Tyrone Garrett, Defendant and Appellant.

Victor J. Morse, under appointment by the Court of Appeal, for Erion Demonta Varnado, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Charles A. French, Craig S. Meyers and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

This appeal arises out of Victor Tyrone Garrett and Erion Demonta Varnado's participation in armed robberies and an attempted armed robbery in November 2008.[1] Both Garrett and Varnado were 17 years old when the offenses were committed, but were tried as adults. (Welf. & Inst. Code, § 707, subds. (b)(3) & (c).) A jury convicted Garrett of six counts of second degree robbery (Pen. Code, § 211),[2] two counts of kidnapping for robbery (§ 209, subd. (b)(1)), one count of attempted robbery (§§ 211/664), and one count of assault with a firearm (§ 245, subd. (a)(2)). For each of the offenses, the jury found true the allegation Garrett personally used a firearm (§ 12022.53, subd. (b)), and as to the assault with a firearm, that Garrett personally discharged a firearm. (§ 12022.53,

---

[1]    Garrett and Varnado were charged along with Antwaan Edwardo Anderson and Vance Hicks. Anderson pleaded guilty before trial, and Hicks admitted his guilt after trial commenced. Neither Anderson nor Hicks is a party in this appeal.

[2]    Undesignated statutory references are to the Penal Code.

2

subd. (c).) Garrett was sentenced to serve a total of 74 years and 4 months to life in prison.

Varnado was also convicted by a jury of two counts of second degree robbery, one count of attempted robbery, and one count of assault with a firearm. The jury also found true the allegation Varnado personally used a firearm during the assault and attempted robbery. However, the jury found Varnado not guilty of four counts of robbery. The jury was unable to reach a verdict as to the two counts of kidnapping to commit robbery, the allegation Varnado personally used a firearm during the second degree robberies, or he discharged a firearm during the attempted robbery. The trial court declared a mistrial as to the counts and enhancements for which the jury could not reach a verdict.

On retrial, Varnado was convicted of the remaining two counts of second degree robbery, and the jury found true the allegation he used a firearm during these robberies. The second jury was not asked to decide whether Varnado discharged a firearm during the attempted robbery. Varnado was sentenced to serve a total of 31 years to life in prison.

On appeal, both defendants contend (1) the evidence of asportation was insufficient to support their convictions of kidnapping for robbery. In a related argument, Varnado contends (2) the trial court erred in refusing defense counsel's proposed instruction informing the jury that "incidental" movement does not amount to kidnapping for robbery.

Varnado further argues (3) evidence regarding the firing of a gun during the attempted robbery was improperly admitted during his retrial to prove he used a gun on a separate occasion, (4) insufficient evidence of intent to commit theft requires reversal of his attempted robbery conviction, and (5) an unduly suggestive identification procedure was used to identify him two days after the robbery.

Garrett separately argues (6) an in-field show up employed by the police shortly after his arrest was an unduly suggestive identification procedure, (7) his *Miranda* rights were violated during his interrogation by the police,[3] and (8) his prison sentence of 74 years and 4 months to life constitutes cruel and unusual punishment because he was a minor at the time of the offenses.

We conclude the defendants' act of moving the victims of kidnapping for robbery from where they were standing into the locked trunk of a car sufficed for the asportation requirement of the offense. Contrary to Varnado's contention, the trial court was not required to give defense counsel's proposed pinpoint instruction. We also find no error in the admission of testimony regarding the discharge of a firearm during the attempted robbery. The evidence was sufficient to establish intent to commit robbery during the attempted robbery. And the police did not use an unduly suggestive identification procedure two days after Varnado's arrest.

As to Garrett's separate claims, the in-field show up did not constitute an unduly suggestive identification procedure. And the police did not violate his Fifth Amendment rights because Garrett knowingly and voluntarily waived his rights after being given a *Miranda* advisement.

Consistent with our original opinion, we affirm Garrett and Varnado's convictions.

As to the sentencing, we now benefit from the California Supreme Court's recent guidance in *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*). After this court filed its original opinion, the California Supreme Court granted review and transferred the cause back to us for reconsideration in light of *Franklin*, *supra*, 63 Cal.4th 261. In *Franklin*, the Supreme Court held the Legislature's passage of Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill No. 260) effectively guarantees a youth offender a parole hearing

---

[3]    See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694; 86 S.Ct. 1602].

4

before the Board of Parole Hearings during a juvenile offender's 25th year of incarceration. (*Id.* at pp. 276-277.) The *Franklin* court declared the new statutory remedy provides a meaningful opportunity for release and renders moot claims that effective life without parole (LWOP) sentences for crimes committed as a juvenile violate constitutional prohibitions against cruel and unusual punishment. (*Ibid.*) After the cause was transferred back to us, we invited the Attorney General and counsel for defendants to file supplemental briefing as to whether *Franklin* requires a limited remand in this case. We have received and considered supplemental briefing from all parties on this issue. We remand the matter to the trial court for the limited purpose of determining whether defendants have had an adequate opportunity to make a record of mitigating evidence that will be relevant at a future youth offender parole hearing.

BACKGROUND

### *Robberies of Kilgore, Cheatham, Douglas, and Cordero* (*Counts 1-4*)

At approximately 9:00 p.m. on November 15, 2008, Jaquan Cheatham and Lonnie Kilgore were walking to a 7-Eleven store. Two males with guns approached Cheatham and instructed him to empty his pockets. Cheatham heard the cocking of a gun and turned over his school identification and telephone. Cheatham gave the robbers his pants so they would know he had turned over everything. Kilgore also took off clothing and handed it to the robbers.

Thomas Douglas and Alexis Cordero were nearby and watched Cheatham and Kilgore get robbed. Cordero explained she initially saw a black car with three male occupants. Cordero then "had a bad feeling" and turned around to see two of the males "attack" a boy behind her. The robbers brandished guns and took everything from the boy –- even his clothes.

Fearing the robbers would attack her group too, Cordero told her friends to run away. Cordero and Douglas hid behind a nearby van. When the same black car drove

5

by, Cordero heard someone from the car tell them to come out from behind the van. Cordero and Douglas did so with their hands up. One of the robbers instructed, "Lean up against the garage and give us everything that you have." The same two robbers that had attacked the boy appeared with guns drawn and took Cordero's shoes, jacket, money, cell phone, and chain. Douglas gave the robbers his necklace and wallet.

At approximately 3:00 a.m. on November 28, 2008, Sacramento County Sheriff's Deputy Michael Putnam drove Cheatham, Kilgore, Areél Robinson, and Markeisha DeMyers to view suspects who had been arrested in Elk Grove. Although Detective Mark Bearor at the Elk Grove Police Department planned to line the witnesses up in a hallway face-to-face with the suspects, the witnesses refused the proposed procedure. Instead, the four witnesses observed the suspects from a patio area through a plate glass window at a distance of 15 to 25 feet. Deputy Putnam led the witnesses, one at a time, to the patio area where they viewed the suspects.

As to the defendants in this appeal, Cheatham stated with certainty Varnado was one of the males who robbed him. However, Cheatham was not able to identify Garrett. DeMyers identified Varnado but not Garrett. The record does not indicate what identifications, if any, were made by Kilgore or Robinson.

### Kidnapping for Robbery of Gutierrez and Gribben (Counts 5-8)

Abel Gutierrez and Sheila Gribben went on their first date together on November 18, 2008. Shortly after midnight on November 19, 2008, they returned from the movies to Gribben's apartment complex in Sacramento. They talked next to Gutierrez's car for approximately 30 minutes when he noticed a champagne color car with four males wearing black sweaters. Gutierrez mentioned to Gribben that "something wasn't right." Gutierrez lost sight of the car behind a hill, but soon saw the four occupants walking by him and Gribben. One of the males pointed a long, silver revolver at Gutierrez's head and instructed him to take off his clothes. Gutierrez refused

6

and was then told to empty his pockets.  Eventually, Gutierrez took out his cell phone, wallet, and keys, and handed them over.  The male with the gun then patted Gutierrez down to see if he had turned over everything.  Gutierrez was then told to hand over the pea coat he was wearing.

The robbers then told Gutierrez to sit down on a curb.  While Gutierrez watched, the males took some earrings and keys from Gribben.  Gutierrez told them to let Gribben go.  The male with braids in his hair responded, "She's not going anywhere."  Gribben complied with an instruction to sit next to Gutierrez on the curb.

The robbers took Gutierrez's keys and attempted to open the trunk of his car.  Unable to do so, they told Gutierrez to unlock his trunk.  Gutierrez unlocked the trunk by pushing a button inside the passenger compartment.  The robbers told Gutierrez to give them the subwoofer speakers he had in the trunk.  But Gutierrez explained they could not easily be removed because they were wired to the car.  The male with braids responded, "We'll just take the whole damn car."  He then told Gutierrez to get into the trunk.

Gutierrez feared the males would end up killing them if he and Gribben got into the trunk.  Hoping to avoid getting into the trunk, Gutierrez told them "just to take off and leave, that they had taken everything we had and weren't going to do anything; that if we were going to try anything we would have done that before any of that had happened."  The male with braids responded, "Are you trying to die tonight?"  The males called Gribben over and put her into the trunk with Gutierrez.  They slammed the trunk twice on Gutierrez's head when trying to close it and succeeded in closing it on the third try.  Gutierrez worried they would not be able to get out.

Gutierrez and Gribben heard the robbers rummaging through the car for a few minutes before they left.  Gribben began to panic and Gutierrez tried to calm her down.  After hearing the robbers run away, Gutierrez and Gribben waited for a few minutes before Gutierrez began to tear away the lining of the trunk.  Gutierrez and Gribben

shouted for help. Approximately 5 to 10 minutes later, Gribben's housemate let them out and called the police. Gutierrez discovered an iPod and headphones had been taken from the interior of the car. Gribben's watch and camera also had been taken.

Several hours later, Sacramento Police Officer Wesley Nezik received word a vehicle matching the descriptions given by Gutierrez and Gribben had been located. Officer Nezik contacted Gutierrez and Gribben and transported them to the Elk Grove area where the vehicle had been found. Gutierrez immediately recognized the car as the one in which he had seen the robbers. Gutierrez and Gribben also recognized items stolen from them.

Officer Nezik then drove Gutierrez and Gribben to an in-field show up at the Elk Grove Police Department. Officer Nezik testified: "[O]n the way to the police department, I explained to them that there were people who were being detained. They may or may not be related to their situation from the previous robbery that happened there. They may or may not be in handcuffs. If they are, it's for our safety and for theirs." At the police station, Gutierrez and Gribben were escorted inside but indicated they were scared about the prospect of meeting the robbers face to face. Officer Nezik led them outside and allowed them to sit in the backseat of the patrol vehicle. The officer testified it was not "an ideal way to do it" but he was the only police officer available to do a field show-up. The patrol car lights were turned on and the suspects were brought into the light one at a time. Given the unusual nature of the field show-up, Officer Nezik instructed Gutierrez and Gribben not to discuss the suspects between themselves. The victims agreed.

As to the defendants in this appeal, Gribben stated about Varnado that he had "a similar haircut" to one of the robbers. By contrast, Gutierrez "stated that he did recognize the hair [on Varnado] because it was very distinct because the braids were sticking up in the air." Neither Gutierrez nor Gribben recognized the second suspect,

8

Vance Hicks.  When Anderson was brought out, Gribben stated:  "That's him.  He was the one pointing the gun at me demanding my stuff" and one of the males who told them to get into the trunk.  Gutierrez also "seemed very confident" in identifying Anderson.  When Garrett was brought out, Gribben was "not sure about him."  Gutierrez said Garrett "looked familiar and that someone there on scene was wearing . . . similar clothing."

### Assault and Attempted Robbery of Mangano (Counts 9-10)

Early in the morning on November 19, 2008, John Mangano delivered newspapers by car in Elk Grove.  Mangano had just gotten back into his vehicle when a "silverfish color" car pulled diagonally in front of his car "and blocked [him] off."  Mangano noticed three doors open and three males got out of the car.  Mangano asked, "Well, what's going on?"  He then observed the male behind the driver holding a black revolver at waist level.  Mangano threw his car into reverse, ducked down, and began to drive away.  Before he ducked, Mangano caught a glimpse of four males from the car.

Mangano had driven approximately 20 to 25 feet when he heard a gunshot.  When Mangano next looked up, he saw two of the males were holding guns "like in the gangster movies" and heard additional shots ring out.  Once Mangano had gotten 40 yards away, he looked up again and saw the males get back into their car.  As the car drove away on Elk Grove Boulevard, Mangano decided to follow it.  While following the car, Mangano called the police with his cell phone.  Elk Grove Police Officers Shane Glaser and Robert Barnes responded to the call in their patrol cars.  Matching the description of the suspect vehicle and location was a gray, four-door Pontiac Grand Am.  The officers pulled the car over and arrested the four occupants:  Varnado, Garrett, Hicks, and Anderson.

A search of the suspect vehicle turned up two handguns, four spent casings, an iPod, headphones, four cell phones, keys, and a purple digital camera, several purses, and a black jacket.

9

After his arrest, Garrett was interviewed by the police. Garrett admitted he was riding with Varnado, Hicks, and Anderson. Along with him, Garrett had a gun he had stolen from his grandfather a few weeks earlier. Garrett's hands were tested for gunshot residue. The test indicated Garrett had recently "fired a weapon, was near a weapon when it was fired, or handled a fired weapon or fired ammunition."

### *Defense Evidence*

Garrett introduced evidence he was at his house on the evening of November 15, 2008, when Kilgore, Cheatham, Douglas, and Cordero were robbed. Garrett's sister, Victoria Garrett, testified he had been present the entire time at a family barbecue that lasted until 1:00 or 2:00 in the morning. This testimony was corroborated by a friend of Garrett's and by a neighbor who testified Garrett had been present at the barbecue.

Varnado introduced the testimony of Dr. William Shomer, an expert on witness identification, perception, and memory. Dr. Shomer testified that (1) "people are highly unreliable with respect to cognition of strangers," (2) people overestimate their certainty of identification when suspects have similar appearances, (3) cross-racial identifications tend to be "far less accurate" (4) the stress of being assaulted by a weapon has an adverse effect on the ability to remember accurately, and (5) the identification procedure employed can make a significant difference in outcomes.

### *Varnado's Retrial*

Varnado was retried after the first jury was unable to reach a verdict on the counts of kidnapping for robbery against Gutierrez and Gribben or on the allegations of personal firearm use against Gutierrez and Gribben. As pertinent to the issues raised on appeal by Varnado, the evidence at the second trial showed the robbers made Gribben sit on the curb about 10 feet from Gutierrez's car during the robbery. Gutierrez did not sit, but stood next to Gribben. According to Gribben, the robbers did not move them to the curb. Instead, Gribben and Gutierrez were already standing there when the robbery started.

10

The robbers told Gutierrez to open his car trunk. When the robbers saw the subwoofer speakers inside they tried to remove them, but were unsuccessful. They debated stealing the car. The robbers then told Gutierrez to get into the trunk. The robbers then instructed Gribben to get up from the curb and climb into the trunk with Gutierrez. The robbers twice slammed the trunk onto Gutierrez's head before they were able to close the trunk.

DISCUSSION

I

*Garrett and Varnado's Arguments Regarding Insufficiency of the Evidence Regarding Kidnapping for Robbery*

Garrett and Varnado contend the evidence was insufficient to convict them of kidnapping for robbery because of the insignificant distance Gutierrez and Gribben were moved during the robbery. Specifically, Garrett and Varnado argue the asportation requirement of kidnapping for robbery was not met for either victim. We disagree.

**A.**

*Standard of Review*

The standard of review for insufficiency of the evidence is well established. In reviewing a claim of evidentiary insufficiency, we "view the evidence in the light most favorable to the judgment and must presume in support of that judgment every fact that the trier of fact could reasonably deduce from the evidence. [Citations.] To survive an insufficiency of evidence challenge, the evidence must be substantial enough to support the finding of each essential element of the crime and special circumstance. Substantial evidence is that which is reasonable, credible and of solid value. The trier of fact weighs the evidence presented, resolves conflicts in the testimony and draws reasonable inferences from the facts before it. If its findings are reasonable and supported by the

11

evidence, reversal of the conviction or of the special circumstances finding is not warranted even if a contrary finding might also be reasonable." (*People v. Johnson* (1992) 5 Cal.App.4th 552, 558; accord *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

**B.**

### *Evidence of the Victims' Movement*

Although labeled by Garrett and Varnado as insufficiency of the evidence arguments, the gravamen of their contentions is this: the short distance the robbers moved Gutierrez and Gribben from the curb to the inside of the car trunk was insufficient as a matter of law to sustain a conviction of kidnapping for robbery. Neither Garrett nor Varnado disputes they moved Gutierrez and Gribben from where they were standing near the car, made the victims get into the trunk of the car, and then closed the trunk to lock the victims inside.[4] Instead, Garrett and Varnado contend the distance involved in Gutierrez's and Gribben's robbery was too short as a matter of law to meet the minimum requirements of the asportation element of kidnapping for robbery.

Even though Varnado's conviction for two counts of kidnapping for robbery rests on the evidence presented at his retrial, he does not point to any meaningful difference on this issue between the evidence presented at the first trial –- which resulted in Garrett's conviction on the two counts of kidnapping for robbery –- and that presented at the second trial in which Varnado was convicted. Our review of both trials shows consistency in that the robbers moved Gutierrez and Gribben from the nearby curb to the rear of the car, had them get into the trunk, and then closed them inside.

---

[4] Although the testimony at Varnado's retrial indicated the robbers moved Gribben approximately 5 to 10 feet from the curb to the trunk of the vehicle, the testimony at Garrett's trial does not indicate the distances involved except to note Gutierrez and Gribben were moved from where they were standing/sitting into the trunk.

## C.

### *Kidnapping for Purposes of Robbery* (*§ 209, subd. (b)(1)*)

Subdivision (a) of section 207 defines kidnapping as follows: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." As the California Supreme Court recently noted, "Section 209, subdivision (b)(1) prescribes greater punishment for aggravated kidnapping where the accused 'kidnaps or carries away any individual to commit robbery. . . .' Kidnapping for robbery requires asportation, i.e., movement of the victim that is not merely incidental to the commission of the robbery and that increases the risk of harm over that necessarily present in the crime of robbery itself. (§ 209, subd. (b)(2); *People v. Rayford* (1994) 9 Cal.4th 1, 12.)" (*People v. Delgado* (2013) 56 Cal.4th 480, 487.)

The test for whether the movement of the victim suffices for a kidnapping for robbery conviction was articulated in *People v. Daniels* (1969) 71 Cal.2d 1119 (*Daniels*). In *Daniels*, "the court concluded that . . . section 209 not only excluded 'standstill' robberies from its scope, 'but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself.' (*Daniels, supra*, 71 Cal.2d at p. 1139.) In other words, *Daniels* 'construed [the aggravated kidnapping statute] to preclude convictions based on movement of the victim that is criminologically insignificant.' " (*In re Crumpton* (1973) 9 Cal.3d 463, 466.)

Determining whether the evidence showed sufficient asportation for kidnapping for robbery requires two considerations: "First, ' "[i]n determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement. [Citation.] This includes the actual distance a victim is

moved.  However, . . . there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.'  [Citations.]"  [Citations.]'  (*People v. Washington* (2005) 127 Cal.App.4th 290, 297.)  'Incidental' means 'that the asportation play no significant or substantial part in the planned [offense], or that it be a more or less " 'trivial change[] of location having no bearing on the evil at hand.' " '  (*People v. Ellis* (1971) 15 Cal.App.3d 66, 70.)  ' " 'The second prong of the *Daniels* test refers to whether the movement subjects the victim to a substantial increase in risk of harm above and beyond that inherent in [the underlying crime].  [Citations.]  This includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes.  [Citations.]  The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased.  [Citations.]'  [Citations.]" [Citation.]'  (*People v. Washington, supra*, 127 Cal.App.4th at p. 297.)  The two elements of the test are related; 'whether the victim's forced movement was merely incidental to the [underlying offense] is necessarily connected to whether it substantially increased the risk to the victim.'  (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.)  '[E]ach case must be considered in the context of the totality of its circumstances.'  (*Ibid*.)"  (*People v. James* (2007) 148 Cal.App.4th 446, 453-454.)

### D.

### *The Movement of the Victims into the Trunk of the Car Sufficed*

As to Gutierrez, we conclude the robbers' moving him from the curb to the car was incidental to the robbery.  Gutierrez had been standing at the curb when the robbers tried unsuccessfully to open the trunk of his car.  When the robbers told Gutierrez to open the trunk, he went to the car and complied.  The robbers attempted to take the subwoofer speakers from the trunk.  However, Gutierrez told them they could not be easily removed because they were wired to the car.  Up to this point, the robbers moved Gutierrez to

14

facilitate their theft of property from Gutierrez and his car. Consequently, the distance Gutierrez traveled from the curb to his car and movement around his vehicle does not accrue to the asportation requirement of kidnapping for robbery. (*People v. Dominguez*, *supra*, 39 Cal.4th at p. 1152.)

However, the robbers' act of forcing Gutierrez to get into the trunk was not incidental to the robbery. As Gutierrez told the robbers at the time, they had taken everything from him and Gribben without resistance. Placing Gutierrez into the trunk did not enable the robbers to take anything. Consequently, we must consider whether moving and locking Gutierrez into the trunk of his car constituted sufficient movement to meet the asportation requirement of kidnapping for robbery.

The distance from outside the trunk to its interior was not far. However, the California Supreme Court has made clear that kidnapping for robbery requires no minimum distance a defendant must move a victim. (*People v. Vines* (2011) 51 Cal.4th 830, 870.) Thus, we proceed to consider the additional factors informing the test for sufficient asportation. (*Daniels, supra,* 71 Cal.2d at p. 1139.) On balance, these factors lead us to conclude the evidence was sufficient to convict Garrett and Varnado of kidnap for robbery. Moving Gutierrez and Gribben into the trunk and locking them inside increased the risks of harm beyond the risks of armed robbery. Even aside from the fact Gutierrez was actually hurt when the robbers twice slammed the trunk on his head, the confinement increased the risks to both victims. Gutierrez feared getting inside the trunk because he thought the robbers would kill him if he complied. This fear is understandable because the robbers could have driven the victims to a remote location where additional crimes would likely have gone unobserved. Gutierrez had to destroy part of his car before he could yell for help. Thus, moving the victims into the locked trunk substantially increased the risks to Gutierrez and Gribben that arose from concealment, physical confinement, and sound insulation.

15

Conversely, the robbers enhanced their opportunity to commit additional crimes by locking the victims into the trunk of a car to which the robbers had the keys. Thus, the robbers facilitated additional thefts from Gutierrez's car and increased their chances of evading notice when departing the crime scene.

Inside the locked trunk, the victims were subjected to enhanced risks even if the car remained stationary. Such risks included possible injury due to attempts to break out and adverse conditions of deprivation if they had failed to escape. Gribben panicked while in the trunk. She testified she thought to herself: "I was going to die." Locking Gutierrez and Gribben inside the trunk decreased the likelihood of detection. Moreover, the robbers restrained the victims in a space from which they were unable to escape by themselves. Gutierrez and Gribben were freed only after a friend happened to hear them banging and yelling after she had turned off her television.

By moving Gutierrez and Gribben into the trunk of the car, the robbers sufficiently increased the risks to the victims that the movement satisfied the asportation requirement of kidnapping for robbery. We conclude the evidence supported Garrett and Varnado's convictions of kidnapping for robbery.

## II

### *Varnado's Request for a Pinpoint Instruction on Movement Necessary for Kidnapping for Robbery*

In a challenge related to the claim the evidence was insufficient to sustain the kidnapping for robbery convictions, Varnado contends the trial court erred in refusing his request to instruct the jury that movement of a victim can be merely incidental to the robbery even if the movement is not necessary for the robbery. We conclude the trial court did not err in refusing to give this instruction.

16

# A.

### *Jury Instructions Given on Kidnapping for Robbery*

During Varnado's retrial, the court instructed jurors on kidnapping for robbery by giving CALCRIM No. 1203. As to the count alleged for the offense against Gribben, the trial court instructed:

"To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit robbery; [¶] 2. Acting with that intent, the defendant took, held, or detained Sheila Gribben by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved Sheila Gribben or made Sheila Gribben move a substantial distance; [¶] 4. Sheila Gribben was moved or made to move a distance beyond that merely incidental to the commission of a robbery; [¶] 5. When that movement began, the defendant already intended to commit robbery, and [¶] 6. Sheila Gribben did not consent to the movement. [¶] As used here, substantial distance means more than a slight or trivial distance. The movement must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery. In deciding whether the movement was sufficient, consider all the circumstances relating to the movement."

The trial court used the same instruction for the additional count of kidnapping for robbery, substituting only Gutierrez's name for Gribben's.

In instructing the jury with CALCRIM No. 1203, the trial court rejected a request by defense counsel for a pinpoint instruction as follows: "Movement can be incidental to the robbery, even if the movement is not necessary for the robbery." As the trial court noted, the defense drew the language of the requested pinpoint instruction from the case of *People v. Hoard* (2002) 103 Cal.App.4th 599. The trial court refused to give the pinpoint instruction, questioning the continuing validity of *Hoard* and finding it would confuse the jury.

17

## B.

### *Pinpoint Instructions Need Not be Given when Redundant to Other Instructions*

" 'A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case.' (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) Specifically, a criminal defendant 'is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt. . . .' (*People v. Johnson* (1992) 3 Cal.4th 1183, 1230.) But where standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 856-857.) Thus, "[w]e bear in mind that ' " ' "[w]hether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." ' " ' (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1027.)" (*People v. Hughes* (2002) 27 Cal.4th 287, 360.)

## C.

### *Varnado's Proposed Pinpoint Instruction*

We agree with the trial court that the pinpoint instruction requested by Varnado's trial counsel was redundant and confusing. First, the proposed pinpoint instruction merely advised the jury not every movement of a robbery victim would necessarily turn the crime into kidnapping for robbery. CALCRIM No. 1203, as given here, sufficiently informed the jury kidnapping for robbery of Gribben and Gutierrez required the victims to have been "moved or made to move a distance beyond that merely incidental to the commission of a robbery" *and* the distance "must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery." Thus, CALCRIM No. 1203 apprised the jury something more than trivial movement was necessary to convict Varnado of kidnapping for robbery. Had the trial court also instructed –- as Varnado requested –- incidental movement during commission

18

of the robbery did not automatically turn the offense into kidnapping for robbery, such additional instruction would have been redundant.

More than simply adding information about the asportation element of kidnapping for robbery, Varnado's requested pinpoint instruction would likely have confused the jury. Telling the jury that "[m]ovement can be incidental to the robbery, even if the movement is not necessary for the robbery" would unnecessarily create a categorical morass for the jury by suggesting different types of movement during a robbery, i.e., movement that is necessary to the robbery, movement that is not necessary to the robbery but incidental to the robbery, and movement incidental to the robbery. Quite simply, movement during the robbery either substantially increases the risk to the victim beyond that necessary to commit the robbery or it does not substantially increase the risk to the victim. (CALCRIM No. 1203; *People v. Delgado, supra,* 56 Cal.4th at p. 487.) This clear distinction between robbery and kidnapping for robbery would have been muddled if the defense's pinpoint instruction would have been given. Accordingly, the trial court properly refused the pinpoint instruction to give CALCRIM No. 1203 to instruct on kidnapping for robbery.

## III

### *Varnado's Challenge to the Admission of Evidence at his Retrial Regarding Shots Fired at Mangano*

Varnado contends the trial court erred in admitting evidence from the first trial about shots fired at Mangano during Varnado's retrial on the offenses committed against Gutierrez and Gribben. We reject the contention.

### A.

### *Trial Court Ruling*

During Varnado's retrial, the prosecution relied on Evidence Code sections 452.5 and 1101, subdivision (b), in moving to introduce evidence Varnado had been previously

convicted of the attempted robbery of Mangano. The trial court exercised its discretion under Evidence Code section 352 to exclude evidence of defendant's prior conviction. However, over the objection of defense counsel, the trial court allowed testimony Varnado had previously fired shots at Mangano as evidence of a common scheme or plan.

**B.**

### *Admission of Evidence Showing Common Scheme or Plan*

Under Evidence Code section 1101, subdivision (b), the trial court may admit "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." Thus, " '[e]vidence of a common design or plan is admissible to establish that the defendant committed the act alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, "[i]n proving design, the *act* is still undetermined. . . ." [Citation.]' (*People v. Ewoldt* [(1994)] 7 Cal.4th at p. [394], fn. 2, italics in original.) To establish a *common design or plan*, the evidence must demonstrate not merely a similarity in the results, but ' "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." [Citation.]' (*Id.* at p. [393].)" (*People v. Balcom* (1994) 7 Cal.4th 414, 423-424 (*Balcom*).) "Although an uncharged offense need not possess unusual or distinctive characteristics to be relevant to establish the existence of a *common design or plan*, the presence of unusual or distinctive shared characteristics may increase the probative value of such evidence for this purpose." (*Id.* at p. 425.)

20

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  (*People v. Dyer* (1988) 45 Cal.3d 26, 73.)  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  [Citations.]'  (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)"  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

## C.

### *Common Scheme to Commit Robberies*

The crimes committed by Varnado against Gutierrez and Gribben and then against Mangano were separated by only a few hours.  As the California Supreme Court has noted, a "close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence."  (*Balcom, supra,* 7 Cal.4th at p. 427.)  Varnado and his accomplices robbed Gutierrez and Gribben using the same car to drive up to Mangano.  In both instances, the robbers used handguns.

The robberies and attempted robbery were part of the same crime escapade that focused on robbing isolated individuals late at night.  As parts of the same crime spree, the trial court did not err in admitting evidence of the attempted robbery of Mangano during the trial on the robbery of Gutierrez and Gribben.  Thus, we reject Varnado's contention the evidence of Mangano's attempted robbery was irrelevant and unduly prejudicial.  The crimes were sufficiently related in time and manner of execution to render the evidence of the Mangano attempted robbery relevant and probative.  (Evid. Code, § 1101, subd. (b).)

We also reject defendant's assertion the Mangano attempted robbery provided unduly inflammatory evidence because "the perpetrators recklessly fired multiple shots at

21

Mangano and his car even as it became clear they would be unable to stop him from fleeing." The testimony regarding the shots fired was brief and not substantially more inflammatory than the threat to kill Gutierrez while a gun was pointed at his head, or Gribben's emotional testimony about her belief she was going to die when the robbers made her get into the trunk. Evidence Code section 352 did not require exclusion of evidence regarding the Mangano attempted robbery. The Mangano attempted robbery was carried out with sufficiently similar reliance on firearms to prevent it from being more prejudicial than probative or more inflammatory than the testimony given by Gutierrez and Gribben. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [evidence of ongoing pattern warrants admission of uncharged misconduct evidence and is less likely to be unduly prejudicial as the similarity between the offenses increases].)

The trial court did not err in allowing evidence of the attempted robbery committed as part of the same crime spree as the Gutierrez and Gribben robberies for the limited purpose of showing a common scheme or plan.

**IV**

***Varnado's Argument Regarding Sufficiency of the Evidence for Attempted Robbery***

Varnado contends we must reverse his attempted robbery conviction because the evidence failed to prove he had an intent to rob Mangano or made any effort to rob him. In so arguing, Varnado concedes the evidence presented at trial showed he and his accomplices pulled their vehicle in front of Mangano's car while it was parked on a rural road, and then fired shots at him as he sped away. This evidence, Varnado argues, fails to show he attempted to rob Mangano. Reviewing the record as a whole, we reject the argument.

22

## A.

### *Standard of Review*

As we explained in part I A., *ante*, when considering a challenge to the sufficiency of the evidence, "the court must review the *whole* record in the light most favorable to the judgment below to determine whether it discloses substantial evidence that is, evidence which is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578, italics added.)

## B.

### *Attempted Robbery*

On the charge of attempted robbery of Mangano, the People had the burden of proving "specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Cal.4th 685, 694.) Varnado contends the evidence failed to establish he had the intent to rob Mangano or he engaged in any overt act for the offense. We disagree.

As to the element of intent, Varnado concedes that "at least one or more of the occupants of the car had engaged in robberies of other victims." Varnado thus refers to evidence that the occupants of the same car that drove up to Mangano had only a few hours earlier engaged in the robberies of Gutierrez and Gribben. Although Varnado's first jury was unable to reach a verdict as to whether Varnado participated in the robbery of Gutierrez and Gribben, the evidence was sufficient for Garrett to be convicted of those robberies during the first trial. However, the evidence did show Varnado was riding in the same backseat with Garrett and in the same car as two other perpetrators of the robberies of Gutierrez and Gribben only several hours after those robberies.

The evidence presented at Varnado's first trial also showed he robbed Cheatham, Kilgore, Douglas, and Cordero only three days before the incident involving Mangano.

23

The offenses committed against Cheatham, Kilgore, Douglas, and Cordero on November 15, 2008, involved the robbers –- including Varnado –- driving up to the victims and threatening them at gunpoint in order to take their personal possessions.

The evidence of the prior robberies of Cheatham, Kilgore, Douglas, and Cordero sufficed to support a conviction for attempted robbery of Mangano.  The California Supreme Court has "long recognized 'that if a person acts similarly in similar situations, he [or she] probably harbors the same intent in each instance'  ([*People v.*] *Thompson* [(1980)] 27 Cal.3d [303,] 319; *People v. Pendleton* (1979) 25 Cal.3d 371, 376–378; *People v. Schader* (1969) 71 Cal.2d 761, 777; [*People v.*] *Kelley* [(1967)] 66 Cal.2d 232, 242–243), and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent.  The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him [or her] by the prosecution."  (*People v. Robbins* (1988) 45 Cal.3d 867, 879, superseded by statute on another ground as noted in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13.)

The evidence at trial showed the same plan –- to drive up to victims and rob them at gunpoint –- was employed against Mangano.  The only difference from the earlier robberies is Mangano was able to escape and the robbers discharged their weapons. However, these differences do not undermine the jury's conclusion Varnado and his accomplices intended to rob Mangano.  Moreover, the robbers' pulling their car in front of Mangano's and brandishing their weapons constituted overt acts toward a robbery that was ineffectual solely due to the victim's ability to speed away.  We conclude the evidence sufficed to show Varnado's intent to rob Mangano.

# V

## *Varnado's Challenge to Identification Procedure*

Varnado argues the suggestive nature of single-photo identifications should have disallowed testimony by the detective who, two days after the robbery, showed Gutierrez a photo of Varnado. We disagree.

## A.

### *Defendant's Burden to Establish that Identification Procedures are Unduly Suggestive*

A criminal conviction may not stand when based on identification of the perpetrator resulting from an unduly suggestive identification procedure. As the California Supreme Court has previously explained, " 'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification . . . . [Citations.]' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

" '[D]efendant has the burden of showing that the identification procedure was unduly suggestive and unfair "as a demonstrable reality, not just speculation." [Citation.] A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Citation.]' 'We have held that an identification procedure is considered suggestive if it "caused defendant to 'stand out' from the others in a way that would suggest the witness should select him [or her]." [Citation.]' (*People v. Cook* (2007) 40 Cal.4th 1334, 1355.)

25

If the defendant fails to show that the identification procedures were unduly suggestive, we need not address any arguments regarding the identifications' reliability under the totality of the circumstances. (*People v. Cook, supra*, 40 Cal.4th at p. 1355; *People v. Cunningham, supra*, 25 Cal.4th at p. 989.)" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 271-272.) We independently review " 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.' " (*People v. Avila* (2009) 46 Cal.4th 680, 698-699, quoting *People v. Kennedy* (2005) 36 Cal.4th 595, 609.)

**B.**

***Detective Bearor's Inquiry into the Offenses during his Meeting with Gutierrez***

Detective Bearor testified he took the photos of Varnado, Garrett, Hicks, and Anderson as part of his regular routine because of "the importance of the person's appearance at the time of their arrest." Thus, Detective Bearor photographed Varnado as he appeared when Gutierrez identified him as one of the robbers only several hours after the robbery.

On November 20, 2008, two days after the robbery, Detective Bearor called Gutierrez to come to the police station to retrieve his stolen property. When he met with Gutierrez, Detective Bearor asked about the robbers' purpose in locking Gutierrez and Gribben into the trunk. Detective Bearor also asked whether Gutierrez remembered the suspects from the in-field show up, and Gutierrez replied affirmatively. Detective Bearor showed Gutierrez the photographs, and Gutierrez recognized the suspects. Upon seeing the photos, Gutierrez explained he recognized Hicks as standing near the robbers' car; Anderson was wearing a red do-rag, Varnado was armed with a western-style handgun, and Garrett was standing near the rear bumper of Gutierrez's car.

The photograph shown by Detective Bearor reflected how Varnado looked at the time Gutierrez identified him. The photograph did not change Varnado's appearance, such as by showing him dressed in jail-issued clothing, or in any other manner to suggest

26

he was one of the robbers. Detective Bearor testified he showed the photographs of the suspects to ask about how the offenses were committed –- rather than about who committed the offenses. Moreover, there is no evidence Detective Bearor expressed any opinion about whether the suspects were actually the robbers. Under these circumstances, we conclude the detective's use of Varnado's post-arrest photo was not unduly suggestive.

## VI

### *Garrett's Challenge to Identification Procedures*

Garrett also contends his convictions for robbery must be reversed because the police employed unduly suggestive procedures to allow the victims to identify him.[5] We disagree.

Garrett asserts he was identified "by means of improper and overly suggestive identification procedures." In support of his argument, Garrett describes the facts surrounding his identification by the victims and witnesses involved with the November 15, 2008, robberies. Garrett also recounts his identification by Gutierrez and Gribben for his part in the November 18-19, 2008, robberies. This factual recitation is followed by a general discussion of the law as it relates to the constitutional prohibition on unduly suggestive identification procedures.

With only one exception, Garrett does not explain why the facts of his identification meet the standards he describes only in generally applicable terms. His legal analysis contains only a single sentence that connects the circumstances of this case with the law. In that sentence, Garrett asserts: " 'Bolstering' is what Deputy Bearor did when he had Gutierrez come down to the station and view the photographs which Bearor

---

[5] Garrett does not challenge his conviction of attempted robbery of Mangano on this basis.

had taken of the suspects as they were shown to Gutierrez and the other victims at the showup." By "bolstering," Garrett refers to a practice that "involves the refreshment of the eyewitness's memory prior to trial" so that a witness relies on the refreshed recollection rather than what he or she originally observed. We are not persuaded by Garrett's argument about bolstering, and we reject the remainder of his contentions as forfeited.

As to the claim of bolstering, Garrett refers to the actions taken by Elk Grove Police Detective Mark Bearor. Detective Bearor photographed each of the robbery suspects after the in-field show up at the Elk Grove Police Department. Although Garrett's argument cites a 1976 law review article generally decrying the vagaries of witness identifications, he cites no case requiring reversal of a criminal conviction on the basis of the "bolstering" he alleges to have occurred here. We find nothing inherently prejudicial about Detective Bearor's procedure because, as we explained in part V B., *ante*, Detective Bearor did not show the photograph of Garrett to Gutierrez for identification purposes. Instead, Detective Bearor used the photos for purposes of inquiring about the details of the robberies. Consequently, we reiterate our conclusion Detective Bearor did not engage in an unduly suggestive identification procedure.

As to any remaining points of contention on the issue of the identification procedures employed, we deem them forfeited. As this court has previously noted, "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) With the exception of his assertion about "bolstering," Garrett has not attempted to explain how the circumstances of his identification violate the constitutional prohibitions he discusses only in generalities. In effect, Garrett leaves us to connect the dots to fill in the picture. We decline to formulate the analysis for Garrett and pass on the issue without further consideration.

28

## VII

### *Garrett's Claim his Miranda Rights were Violated*

Garrett contends his convictions must be reversed because his custodial interrogation was coercive and violated his rights under the Fifth and Sixth Amendments. We reject the contention.

### A.

### *Miranda Advisement*

The following exchange occurred between Detective Strange and Garrett at the Elk Grove Police Department:[6]

"DET. STRANGE: What's up Victor? I didn't realize you still had these [handcuffs] behind your back. (Unintelligible) get that. Just so we're all completely clear, you realize you're in custody, right?

"V. GARRETT: Mm-hmm.

"DET. STRANGE: Okay. Um, at this point you're under arrest for uh – for, uh – attempted robbery –

"V. GARRETT: Mm-hmm.

"DET. STRANGE: Okay? And, uh, I talked to a couple of the other guys so it's not a big deal. I mean, you guys did what you did, just kinda had a night of it, but uh – but we just wanna put everything out on the table now and just make sure you can walk out of here kinda clean-slated –- make sure there's nothing hanging over your head, okay?

"V. GARRETT: Alright.

---

**6**    We quote the transcript of the interview between Detective Strange and Garrett as reflected in an exhibit submitted to the jury. The interview was videotaped and in considering Garrett's argument, we have viewed the videotape.

"DET. STRANGE:  So, um, you want water or anything?

"V. GARRETT:  Mmm yeah.

"DET. STRANGE:  I'll grab one for you, okay?  Just be a second.  Be back in just a second here.  Can you grab me a water?

"(BEGIN CLIP)

"DET. STRANGE:  Okay.  I gotta go through that before I can really talk to ya, um, so we can clean the –- clean the slate for tonight, so, um.  Anything you say um –- or, sorry.  You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to the presence of an attorney if you want before and during any questioning and if you can't afford an attorney then one can be appointed to you free of charge.

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Do you understand all of that?

"V. GARRETT:  (Nods Head)

"DET. STRANGE:  Okay.  So, tonight obviously you guys got hemmed up.

"V. GARRETT:  Yeah.

"DET. STRANGE:  Kinda got caught red-handed.  So, what I wanna do is try to clean the slate for the whole night.

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  Okay?  So, um, what I'm gonna ask of you to do is go back for the beginning of the night when you guys all got in the car and just run me through the whole night?  Okay?  Because, just so you know –- and, let's be honest, okay?  Some cops try to play tricks and things like that.  I'm not gonna do that, okay?

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  I'm gonna –- I'm gonna shut you down if I know you're telling me a lie –

30

"V. GARRETT:  Mm-hmm.

"DET. STRANGE:  -- so I don't even wanna deal with lies.  I'm just gonna come at you straight.  Obviously you're going to jail –- or going to juvenile hall in your case.  Obviously you've got some charges that are gonna be over your head and let's be honest, they're kind of significant at this point so I think the best thing we can do is just have you be honest through the whole thing because then at least it shows –- I –- in my eyes at least –- that hey, you know what?  I was an idiot tonight.  I'm sorry for what I did and I –- I'm –- I'm ready to pay the consequence of what I have to do because that's just how the world works.

"V. GARRETT:  Mm-hmm."

## B.

### *Waivers of Miranda Rights*

In *Miranda v. Arizona*, the United States Supreme Court held that "when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.  Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his [or her] right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He [or she] must be warned prior to any questioning that he [or she] has the right to remain silent, that anything he [or she] says can be used against him [or her] in a court of law, that he [or she] has the right to the presence of an attorney, and that if he [or she] cannot afford an attorney one will be appointed for him [or her] prior to any questioning if he [or she] so desires.  Opportunity to exercise these rights must be afforded to him [or her] throughout the interrogation.  After such warnings have been given, and such opportunity afforded him [or her], the individual may knowingly and intelligently waive these rights and agree to answer

31

questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him [or her]." (*Miranda v. Arizona*, *supra*, 384 U.S. at pp. 478-479.) To this end, the Supreme Court cautioned that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." (*Id*. at p. 475.)

Nonetheless, a defendant need not expressly waive his or her *Miranda* rights in order to indicate a voluntary and uncoerced desire to answer questions posed by the police. The California Supreme Court has noted that "decisions of the United States Supreme Court and this court have held that such an express waiver is not required where a defendant's actions make clear that a waiver is intended." (*People v. Whitson* (1998) 17 Cal.4th 229, 250.) "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 [130 S.Ct. at pp. 2259-2261].) "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." (*Miranda v. Arizona*, *supra*, 384 U.S. at p. 478.)

Of course, minors have the same rights under the Fifth and Sixth Amendments as do adults. (*People v. Davis* (1981) 29 Cal.3d 814, 823-825.) In *People v. Davis*, the California Supreme Court addressed the issue of custodial interrogation as it applied to a 16-year-old male who was suspected of rape and murder. (*Id.* at pp. 819, 823.) The defendant in *Davis* argued his confession was involuntary even though he had been advised of his *Miranda* rights prior to custodial questioning. (*Id.* at p. 823.) The record showed he was interviewed at a police station after being informed of his *Miranda* rights. (*Ibid.*) The defendant indicated he waived those rights and answered questions for three hours before being arrested and placed in a holding cell. (*Id.* at p. 824.) The

interviewing police officer came back and asked the defendant if he wished to have dinner. After replying yes, the officer asked if defendant had killed the victim. The defendant nodded affirmatively. (*Ibid.*) While acknowledging a "sensitivity to the youth and inexperience of defendant," the Supreme Court held that "[a]lthough defendant was a minor, that fact alone does not establish that his confession was involuntary. (*People v. Lara* (1967) 67 Cal.2d 365, 378-379.) The evidence tended to show that he was fully aware of his rights, and was not frightened into submission by the officers' behavior." (*Id.* at p. 825.) Youth thus is one of the factors to be considered in determining whether the totality of the circumstances establishes coercive questioning in derogation of the Fifth and Sixth Amendments. (*Id.* at p. 824.)

" 'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra*, 384 U.S. 436 [86 S.Ct. 1602], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.' " (*People v. Kelly* (1990) 51 Cal.3d 931, 947.) Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained (*ibid.*), we " 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979, quoting *Miller v. Fenton* (1985) 474 U.S. 104, 112 [106 S.Ct. 445, 450]; accord, *People v. Kelly, supra,* 51 Cal.3d at p. 947.)

## C.

### *Garrett Waived his Right to Remain Silent*

Garrett argues he did not waive his *Miranda* rights expressly or tacitly. Although he acknowledges Detective Strange gave a *Miranda* advisement, he contends the detective "raced through" the recitation to ask questions so Garrett "could 'walk out of

here kinda clean-slated,' with 'nothing hanging over [his] head.' " Combined with his youth, the late hour of the questioning, and the custodial nature of the environment, Garrett asserts he was coerced into giving a confession. We are not persuaded.

As we have recounted, Detective Strange advised Garrett of his *Miranda* rights. Although Garrett asserts he did not waive his rights, the transcript and videotape show he nodded to affirm he understood his *Miranda* rights.

Detective Strange began the interview by clearly stating, "Just so we're all completely clear, you realize you're in custody, right?" Garrett indicated he understood. Garrett did not indicate in any way that he was fearful, did not wish to speak with the detective, or even that he was uncomfortable. Detective Strange removed Garrett's handcuffs and offered him a bottle of water.

Not until the detective had given the *Miranda* advisement and told Garrett he was going to go to jail or juvenile hall anyway did Detective Strange begin to ask about the events of the evening that led to the arrest. Detective Strange did not attempt to elicit answers with the promise of leniency. Instead, he advised Garrett to simply "pay the consequence" of having been "an idiot" that evening. Thus, the record shows the detective indicated Garrett's answers would have adverse consequences.

Garrett argues that "Detective Strange resorted to vague half-truths and half-lies by telling [him] the situation was 'no big deal' and that he was 'obviously' going to juvenile hall as the result of his actions." Garrett's argument takes Detective Strange's statements out of context. The detective informed Garrett: "Obviously you're going to jail –- or going to juvenile hall in your case. Obviously you've got some charges that are gonna be over your head and let's be honest, they're kind of significant at this point." Detective Strange told Garrett he "[k]inda got caught red-handed." Moreover, the detective indicated Garrett's statement was not even necessary because he had "talked to a couple of the other guys so it's not a big deal." Contrary to Garrett's assertion on

34

appeal, the context of Detective Strange's comment made clear it was "not a big deal" to add to the other statements given by Garrett's co-conspirators. The detective did not state or imply Garrett's situation or the evidence against him was "not a big deal." Instead, Detective Strange several times expressed Garrett faced very serious charges after being caught "red-handed."

Detective Strange did not badger or yell at Garrett. And the questioning was not protracted. Although the hour may have been late and the questions posed at the police station, we conclude these factors did not transform Detective Strange's questioning into an exercise in coercion.

We also conclude Garrett's youth did not render ineffective his waiver of his *Miranda* rights. In so concluding, we recognize "a child's age properly informs the *Miranda* custody analysis." (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 264 [131 S.Ct. 2394, 2399, 180 L.Ed.2d 310].) In *J.D.B.*, the United States Supreme Court "observed that children 'generally are less mature and responsible than adults,' [citation]; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [citation]; that they 'are more vulnerable or susceptible to . . . outside pressures' than adults [citation]; and so on." (*Id.* at p. 272.)

Garrett was 17 years and 2 months old at the time of his questioning. Thus, Garrett was only 10 months away from becoming an adult. Detective Strange was aware of Garrett's age, as noted by his reference to juvenile hall. In this context, the transcript shows the detective amplified the *Miranda* advisement with clear and plain language explaining Garrett was going to juvenile hall or jail, was facing very serious charges, had been caught "red-handed," and would suffer the consequences of his actions. The detective's statements admonished Garrett in an age-appropriate manner and Garrett voluntarily chose to answer the questions posed to him.

35

In view of the totality of the circumstances of Garrett's questioning by Detective Strange, we conclude Garrett's rights under the Fifth and Sixth Amendments were not violated.

## VIII

### *Sentencing*

In the original briefing, Garrett contended his sentence of 74 years and 4 months to life in prison for nonhomicide crimes committed as a minor constitutes cruel and unusual punishment under the Eighth Amendment.  Based on the California Supreme Court's recent decision in *Franklin*, *supra*, 63 Cal.4th 261, we conclude Garrett's original argument is moot.  However, all parties in their post-transfer supplemental briefing argue *Franklin* requires a remand to the trial court for the limited purpose of determining whether defendants have had an adequate opportunity to make a record of mitigating evidence that will be relevant at a future youth offender parole hearing.  We agree.

### A.

### *Additional Background*

Both Garrett and Varnado were 17 years old when they committed the offenses for which they were convicted.  In January 2011, the trial court sentenced Garrett to serve a term of 74 years and 4 months to life in prison.  In December 2011, the trial court sentenced Varnado to serve a total of 31 years to life in prison.

### B.

### *Analysis*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments" and "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108] quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [111

S.Ct. 2680, 115 L.Ed.2d 836].) This constitutional right "'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned"' to both the offender and the offense." (*Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455, 2458, 183 L.E.2d 407], quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [125 S.Ct. 1183, 161 L.Ed.2d 1].)

In *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court held the Eighth Amendment "prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." (*Id*. at p. 75.) The court explained: "As compared to adults, juveniles have a "'lack of maturity and an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his [or her] actions, but his [or her] transgression 'is not as morally reprehensible as that of an adult.' [Citation.]" (*Id*. at p. 68.) The court also explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id*. at p. 69.)

Turning to the severity of an LWOP sentence, the *Graham* court explained such a sentence "deprives the convict of the most basic liberties without giving hope of

restoration, except perhaps by executive clemency―the remote possibility of which does not mitigate the harshness of the sentence," and noted this is "an especially harsh punishment for a juvenile," who "will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender." (*Graham*, *supra*, 560 U.S. at pp. 69-70.) Finally, the court explored the penological justifications for such a sentence and concluded them to be "not adequate to justify life without parole for juvenile nonhomicide offenders." (*Id*. at p. 74.) However, the court was also careful to point out the Eighth Amendment "does not require the State to release that offender during his [or her] natural life," explaining: "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Id*. at p. 75.)

In *Miller*, *supra*, 132 S.Ct. 2455, the United States Supreme Court held the Eighth Amendment forbids a state from *mandating* the imposition of an LWOP sentence on a juvenile homicide offender. (*Id*. at p. 2469.) The court explained: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her]

38

inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id*. at p. 2468.) The court concluded: "Although we do not foreclose a sentencer's ability to [impose an LWOP sentence on a juvenile] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy," i.e., the "functional equivalent" of an LWOP sentence, "constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. . . . [T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'" (*Id*. at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

In *Franklin*, *supra*, 63 Cal.4th 261, our Supreme Court held, "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence'

[citation], so too does *Miller*[, *supra,* 131 S.Ct. 2394] apply to such functionally equivalent sentences," such that "a juvenile may not be sentenced to the functional equivalent of LWOP for a homicide offense without the protections outlined in *Miller*." (*Franklin, supra,* at p. 276.)  However, the court also held the Legislature's passage of Senate Bill No. 260 that became effective January 1, 2014, and provides juvenile offenders with an opportunity for parole at least by their 25th year of incarceration, renders moot an assertion that "an otherwise lengthy mandatory sentence" was imposed in violation of *Miller*, at least where the defendant is not excluded from eligibility for such a parole hearing.  (*Franklin, supra,* at p. 280.)

In so holding, the court explained, "the Legislature passed Senate Bill No. 260 explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*Franklin*, *supra*, 63 Cal.4th at p. 277.)  It did so by adding section 3051 to the Penal Code, "which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration," depending on the length of the offender's "'controlling offense.'" (*Id.* at p. 277, quoting § 3051, subds. (a)(2)(B), (b).)  Thus, section 3051 "provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration," unless they come within one of the statute's exclusions, set forth in subdivision (h).  (*Franklin, supra,* at p. 277.)  While a juvenile offender's original sentence remains operative, "section 3051 has changed the manner in which [that] sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole," thereby "supersed[ing] the statutorily mandated sentences" of non-excluded juvenile offenders.  (*Id.* at p. 278.)  "The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id.* at pp. 278-279.)  Because the parole eligibility cap of section 3051 supersedes the mandatory sentence imposed by the trial court, "[s]uch a sentence

40

is neither LWOP nor its functional equivalent," and therefore, "no *Miller* claim arises." (*Franklin, supra,* at p. 280.)

Here, as in *Franklin*, *supra*, 63 Cal.4th 261, neither Garrett nor Varnado comes within any of section 3051's exclusions and their controlling offenses carried a term of 25 years to life, making each of them eligible for a youth offender parole hearing during his 25th year of incarceration. Thus, Garrett and Varnado are both beneficiaries of the newly enacted provision in section 3051 that "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin*, *supra*, 63 Cal.4th at p. 281.) In short, Senate Bill No. 260 has rendered moot the *Miller* claim*, supra,* 132 S.Ct. 2455 originally brought by Garrett by superseding his trial court-imposed sentence, effectively reforming the parole eligibility date making him eligible for parole during his 25th year of incarceration. Even though Varnado did not make a *Miller* claim based on his trial court-imposed sentence of 31 years to life, Senate Bill No. 260 also applies to effectively reform the parole eligibility date making him eligible for parole during his 25th year of incarceration.

Ordinarily, the conclusion a claim is moot ends our inquiry. However, in *Franklin*, the court remanded the matter to the trial court for the limited purpose of determining whether or not the juvenile offender in that case "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 269.) This was done because the youth offender parole hearing established by Senate Bill No. 260 "shall provide for a meaningful opportunity to obtain release" (§ 3051, subd. (e)), which requires the Board of Parole Hearings to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c)), the statutory scheme also "contemplate[s] that

41

information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration" (*Franklin* at p. 283, citing § 3051, subd. (f)), and it was "not clear" whether the juvenile offender in *Franklin* "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Id.* at p. 284.) Indeed, because the juvenile offender in *Franklin* was sentenced before *Miller* was decided, and because the term imposed was a mandatory sentence, the trial court understandably deemed such mitigating evidence irrelevant. (*Franklin* at p. 282.)

Here, the record shows Garrett and Varnado were sentenced in 2011 before *Miller*, *supra*, 132 S.Ct. 2455, before *Caballero*, *supra*, 55 Cal.4th 268, and before the Legislature enacted sections 3051 and 4801. Thus, the trial court did not have the benefit of the Legislature's later-enacted legislation to ensure the youth-related factors identified in *Miller* would be taken into account at youth parole hearings mandated for the 15th, 20th, or 25th year after sentencing. While some evidence of age and immaturity was presented at sentencing, neither the parties nor the trial court could have foreseen the substantial changes in the law involving sentencing of juvenile offenders. Accordingly, we cannot determine whether defendants had sufficient opportunity to include on the record the sort of information that will be relevant at a youth offender parole hearing under sections 3051 and 4801. (*Franklin, supra*, 63 Cal.4th at p. 284.)

## DISPOSITION

Our June 30, 2014 decision is vacated. The convictions and sentences of Victor Tyrone Garrett and Erion Demonta Varnado are affirmed. The matter is remanded to the trial court for the limited purpose of determining whether Victor Tyrone Garrett and Erion Demonta Varnado were afforded adequate opportunities to make a record of information that will be relevant to the Board of Parole Hearings to fulfill its statutory

42

obligations under Penal Code sections 3051 and 4801, and, if not, to allow Victor Tyrone Garrett, Erion Demonta Varnado, and the People an adequate opportunity to make such a record.

_____/s/_____

HOCH, J.

We concur:

_____/s/_____

HULL, Acting P. J.

_____/s/_____

ROBIE, J.